Filed 8/27/24  Cal. Natural Gas Vehicle Coalition v. State Air Resources Bd. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CALIFORNIA NATURAL GAS VEHICLE COALITION, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> STATE AIR RESOURCES BOARD, <br><br> Defendant and Appellant. | F084229 <br><br> (Super. Ct. No. 20CECG02250) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  William Terrence, Judge.

Akin Gump Strauss Hauer & Feld, Dario J. Frommer, Andrew Oelz, Ashley Vinson Crawford, Aileen M. McGrath, and Zach ZhenHe Tan for Plaintiff and Appellant.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Tracy L. Winsor, Evan Eickmeyer, L. Elizabeth Sarine, and David M. Meeker, Deputy Attorneys General, for Defendant and Appellant.

Actium, Mike Gatto, Allan Johnson, and Jonathon D. Nicol for Western Growers Association, NGVAmerica, and Western Propane Gas Association as Amici Curiae on behalf of Plaintiff and Appellant.

-ooOoo-

This case considers whether the State Air Resources Board (Board) complied with applicable legal rules when adopting the Advanced Clean Trucks Regulation (Regulation). The challenge to the Regulation is brought by the California Natural Gas Vehicle Coalition (Coalition), an association of companies and interested parties that have adopted or propose to utilize natural gas as an alternative fuel in the fight against air pollution. Vehicles incorporating this technology are referred to as "low-NOx" because they are designed to substantially reduce the amount of nitrogen oxides produced during use. Contrary to the Coalition's goals, the Regulation focuses on the use of electric vehicles, which are referred to as "zero-emission" based on their lack of emissions during use. The Coalition contends the focus on zero-emission vehicles (ZEV) actively harms those that have already adopted natural gas solutions.

In this matter, the Coalition argues that the Board failed to comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and the Administrative Procedures Act (APA; Gov. Code, § 11340 et seq.) when it promulgated the Regulation. The claims generally relate to the Board's response to proposals suggesting a low-NOx vehicle credit should apply to sales mandates applicable to ZEV. The trial court rejected each of the claims made against the Board and denied the Coalition's petition. The Coalition appeals from this judgment. In its cross-appeal, the Board contends the trial court erred in augmenting the administrative record to include a document that was referenced by several comments during the regulatory proceedings but was never submitted to the Board.

For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The issues in this case arise out of the administrative rulemaking process related to the Regulation. Relevant to these proceedings, the Board issued a notice of preparation of a draft substitute environmental document in 2018. The notice described the proposed regulatory strategy as "transitioning Class 2b – 8 medium- and heavy-duty (MD/HD)

2.

trucks to zero-emission technologies to meet air quality, climate, and public health protection goals." The Regulation was noted as "one step in a broader strategy to achieve a transformation to zero-emission capable technologies in all mobile source sectors." The notice further explained that the Regulation "would require 2.5 percent of annual MD/HD vehicle sales in California to be zero-emission capable starting in 2023, and growing to 15 percent of sales by 2030. Truck manufacturers would be able to earn credits for exceeding their annual California sales requirements which can then be banked and/or traded."

This notice was followed by a public comment period and was surrounded, both before and after, by multiple workshops and meetings with relevant stakeholders. During these many workshops and comment periods, stakeholders, including the Coalition, raised issues with the Board that included suggestions of a low-NOx vehicle credit being granted.

In October 2019, the Board released its initial statement of reasons for the Regulation, which included a regulatory impact assessment and its draft environmental analysis for the project. In this document, the Board considered but rejected a low-NOx vehicle credit as an alternative to the Regulation. The Board stated that it was "already in the regulatory process to maximize NOx reductions from medium- and heavy-duty from [*sic*] combustion engines," "[l]ow NOx engines do not achieve any GHG[1] reductions and would not eliminate [particulate matter] from exhaust nor reduce [particulate matter] from brake wear," use of renewable fuels are already covered by a different regulatory program, and "this alternative concept will not advance the adoption of heavy-duty zero-emission technologies and develop a self-sustaining [zero-emission] truck market."

The public was asked to comment on these documents. In response, the Board received several letters that strongly encouraged the adoption of low-NOx technologies

---

**1**        "GHG" refers to greenhouse gas.

within the Regulation.  These included several requests for, in roughly similar language, "including … low NOx trucks that meet or beat a 0.02 g/bhp-hr NOx standard within the next 7 years AND use renewable fuel or renewable energy that reduces GHG emissions by 50[ percent] or more compared to diesel," while claiming that such technologies were the most cost effective in the near term and the cleanest technologies available.  Other letters noted substantial investments already made in low-NOx vehicles and questioned both the effect regulations encouraging a direct shift to ZEV would have on those industries and the effectiveness of excluding low-NOx vehicles from consideration in the Regulation.

In line with regulatory processes, the Board held public hearings on the Regulation, made modifications that resulted in additional comment periods, and worked toward producing a final environmental analysis and eventual adoption of the Regulation. As with the initial comment period, the Board again received multiple letters suggesting incorporation of a low-NOx vehicle credit or vehicles using alternative fuels into the Regulation.

*Overview of the June 2020 Final Environmental Analysis*

On June 23, 2020, the Board released its final environmental analysis for the Regulation.  The 120-page base document includes several chapters relevant to this litigation.  These chapters cover the project description, impact analyses and mitigation measures, and alternatives analysis.  Due to its relevance to this litigation, the final environmental analysis is described in greater detail *post*, although additional facts are included in the argument sections where appropriate.

The final environmental analysis begins by noting the Board released its draft environmental analysis in October 2019, received 484 comment letters, and determined that four of those letters include comments raising significant environmental issues related to the draft which required a response.  Otherwise, the final environmental analysis only made minor modifications to the draft environmental analysis.

4.

As the Board summarizes its efforts, the "proposed … [R]egulation aims to accelerate adoption of medium- and heavy-duty ZEV[] with a gross vehicle weight rating … greater than 8,500 [pounds] as part of California's strategy to reduce emissions from transportation." The Regulation seeks to "meet several objectives and recommendations included in the Sustainable Freight Action Plan, Mobile Source Strategy …, and ZEV Action Plan," while at the same time complimenting approved regulations related to required zero-emission purchases by transit agencies and meeting the zero-emission purchase requirements for government fleets in Assembly Bill No. 739 (2017–2018 Reg. Sess.). Additionally, the requirements of "the federally and California-adopted Phase 2 GHG" regulation, existing executive orders and directives issued by the Governor, and the State Implementation Plan for achieving federal health-based standards, all allegedly benefit from the Regulation.

Further, the Board notes that California's State Implementation Plan had already "identified zero-emission technology measures for the medium- and heavy-duty vehicle sectors," specifically transit buses, delivery trucks, and airport shuttles. The Regulation was designed to continue "implementation of these strategies to increase the first wave of heavy-duty ZEV deployments" while including "last mile delivery vehicles" and expanding "to include a wider range of vehicles in well-suited applications." In addition to these goals, the document notes many other existing regulatory structures that the Regulation was designed to complement, overlap with, or assist with, including the Low Carbon Fuel Standard Program, which grants credits to fleet owners that consume electricity or produce alternative fuels onsite.

The final environmental analysis then outlines the environmental review process and the public comment history before defining the project and identifying reasonably foreseeable compliance responses. Relevant to this case, the Board identifies

5.

12 objectives related to the proposed project. These are listed, in summary form, as follows:

(1) Accelerate the deployment of vehicles that achieve the maximum emissions reduction possible from medium- and heavy-duty vehicles to assist in the attainment of national ambient air quality standards for criteria air pollutants;

(2) Reduce the state's dependence on petroleum as an energy resource and support the use of diversified fuels in the state's transportation fleet;

(3) Decrease GHG emissions in support of statewide GHG reduction goals by adopting strategies to deploy medium- and heavy-duty ZEV in California as identified in the Scoping Plan as "Last Mile Delivery," which was developed to reduce GHG emissions in California, as directed by Assembly Bill No. 32 (2005–2006 Reg. Sess.);

(4) Develop a regulation that is consistent with and meets the goals of the State Implementation Plan;

(5) Maintain and continue reductions in emissions of GHG beyond 2020, in accordance with Assembly Bill No. 32 (2005–2006 Reg. Sess.);

(6) Lead the transition of California's medium- and heavy-duty transportation sector from internal combustion to all electric powertrains;

(7) Complement existing programs and plans to ensure, to the extent feasible, that activities undertaken pursuant to the measures complement, and do not interfere with, existing planning efforts to reduce GHG emissions;

(8) Incentivize and support emerging zero-emission technology that will be needed to achieve the Board's State Implementation Plan goals;

(9) Achieve emission reductions that are real, permanent, quantifiable, verifiable, and enforceable;

(10) Provide market certainty for zero-emission technologies and fueling infrastructure to guide the acceleration of the development of environmentally superior

6.

medium- and heavy-duty vehicles that will continue to deliver performance, utility, and safety demanded by the market;

(11) Take steps to ensure all Californians can live, work, and play in a healthful environment free from harmful exposure to air pollution; and

(12) Spur economic activity of zero-emission technologies in the medium- and heavy-duty vehicle sectors.

In line with these objectives, the final environmental analysis then defines the proposed project as having "two primary elements": "First, it requires manufacturers to make a percentage of truck and bus sales in California to be zero-emissions. Second, it requires one-time reporting of information from large organizations including retailers, manufacturers, and government agencies, about contracted services requiring the use of trucks and shuttles in addition to their medium- and heavy-duty vehicle fleet."

The next major relevant section of the final environmental analysis covers the impact analysis and consideration of mitigation measures. After a brief summary, this chapter considers 18 potential environmental impacts and the mitigation measures identified for each. Topics include aesthetics, air quality, biological and cultural resources, GHG, land use planning, and transportation/traffic, among others.

Relevant to the disputes in this case, the discussion related to air quality found a potentially significant impact in short-term construction-related effects. The analysis notes that the project "could result in an increase in manufacturing and associated facilities to increase the supply of ZEV[], along with construction of new hydrogen fueling stations and electric vehicle charging stations to support ZEV operations." These activities "would be anticipated to result in an increase in criteria air pollutants and toxic air contaminates." However, the Board believes the air quality impact "could be reduced to a less-than-significant level by mitigation that can and should be implemented by local lead agencies, but is beyond the authority of [the Board]." The Board then provides a list of laws covering new construction projects and notes that new construction should

qualify as a project for which local environmental review would be required. The Board concludes by stating that "while impacts could be reduced to a less-than-significant level by land use and/or permitting agency conditions of approval," a conservative view of the impact should consider it potentially significant and unavoidable.

The final major relevant section of the final environmental analysis concerns alternatives. The discussion begins by outlining its approach to the alternatives analysis and repeats the 12 project objectives noted above. The analysis then describes the three alternatives considered. The first, titled No Project Alternative, is "included only to assist in the analysis and consideration of" the project and provides that existing "conditions would continue, and truck sales would continue as they have been to date." The second, titled Less Stringent ZEV Sales Requirement, proposes implementing a structure where 3 percent of manufacturer sales would be ZEV at the start, ramping up to 15 percent in 2030, and excluding all Class 8 vehicles. This option was considered to provide lower overall benefits than the current plan. The third, titled More Stringent in Early Years ZEV Sales Requirement, proposes implementing a structure where 15 percent of sales would be ZEV in all classes, ramping up to 40 percent in 2030. This option was considered to meet more reduction goals but also to raise substantial risks as to whether it could be met.

After discussing these three options, the final environmental analysis lists four alternatives considered but rejected and thus not given detailed consideration. The first of these, titled Balanced Heavy-Duty Truck and Bus Low NOx Credit Policy Approach, is described as giving "credit for combustion vehicles that meet a 0.02 g/bhp-hr NOx certification standard or better to count towards the ZEV requirement." The analysis states that the Board was "already in the regulatory process to maximize NOx reductions" that was expected to establish a new standard by the 2024 model year. Further, the analysis states, "Low NOx engines do not achieve any GHG reductions and would not eliminate [particulate matter] from exhaust nor reduce [particulate matter] from brake

8.

wear." Finally, the analysis concludes, "[T]his alternative concept will not advance the adoption of heavy-duty zero-emission technologies and develop a self-sustaining [zero-emission] truck market, which is a cornerstone of California's long-term transportation strategy to reduce localized pollution and GHG emissions. Therefore, this proposed alternative is rejected because it would duplicative [*sic*] with [Board] efforts already underway and would only add complexity to the Proposed … Regulation with no additional NOx emission reductions and would result in fewer [particulate matter] reductions and no GHG reduction."

Along with the final environmental analysis, the Board provided its response to comments for the draft environmental analysis. In this document, the Board concluded that only four comment letters out of the 484 comments received required substantive responses. One of those comments touched on low-emission diesel fuels and resulted in the Board responding that the "proposed [R]egulation order does not involve a low emission diesel standard, and thus, the comment does not appear to be related to proposed project."

*Final Regulatory Proceedings and Subsequent Lawsuit*

Following the release of its final environmental analysis, the Board held an additional public hearing. As with the prior comment periods, several commentors raised issues relating to including a low-NOx vehicle credit in the Regulation. In addition, Board staff briefly discussed low-NOx efforts being undertaken through other regulations. And some Board members noted both that the Regulation was focused on electric vehicles and that additional work was being done to improve existing engine requirements. At the conclusion of this hearing, the Board approved the Regulation. This approval allowed the Board's executive officer to take the final steps for approval.

Following this approval, the executive officer determined no further modifications to the regulatory language would be required and that no additional environment analysis was required. Shortly thereafter, the Board issued its final statement of reasons.

9.

Included with the final statement of reasons are Board responses to comments that were received throughout the process. Within these responses, the Board notes those comments received that suggest the Regulation include a credit for low-NOx engines and renewable fuels. The Board responded to these comments by noting, "The purpose of the … [R]egulation is to accelerate the widespread adoption of [ZEV] in the medium- and heavy-duty truck sector to reduce harmful emissions from on-road mobile sources beginning with the 2024 model year," before reciting what it calls the primary objectives of the Regulation. These primary objectives include several references to zero-emission goals, including accelerating a first wave of zero-emission truck deployments, achieving 100 percent zero-emission pickup and delivery in local applications by 2040, supporting other entities' plans for 100 percent zero-emission trucks, enabling a large-scale transition to zero-emission technology, maximizing the total number of ZEV deployed, and fostering a self-sustaining zero-emission truck market. The response also discusses other regulatory efforts that cover low-NOx engines and low-carbon fuels and argues that providing the requested credits would achieve fewer emission benefits and would be counter to the Board direction to maximize the number of ZEV sold. In addition, several other comments and responses discuss low-NOx issues or other vehicle credit options.

A second notice of decision was filed in February 2021, and the Regulation was approved in March 2021.

As the Regulation was being finalized, the Coalition filed a petition for writ of mandate challenging the process by which the Regulation was promulgated. After the Regulation was finalized, the Coalition filed a second amended petition. In all filings, the Coalition raised the issues discussed in the appeal related to CEQA and the APA. In addition, the Coalition sought to augment the administrative record with three documents, including a white paper written in May 2016. The trial court concluded the white paper was "cited and hyperlinked in one of the comment letters submitted," and thus should be part of the record.

On the merits, the trial court rejected the Coalition's arguments of error. With respect to CEQA, the trial court found substantial evidence supported the Board's rejection of requests to include a low-NOx vehicle credit as an alternative and that the Board had no further obligation to consider low-NOx vehicles as a mitigation measure to the project. And, although the trial court concluded the Board had failed to respond to certain public comments regarding the Regulation, it found that error harmless. As for the APA, the trial court concluded the Board had conducted a proper economic analysis and had properly rejected the use of a low-NOx vehicle credit in its analysis.

The cross-appeals in this matter timely followed.

## DISCUSSION

As noted above, the Coalition raises a series of concerns under CEQA and the APA. More specifically, under CEQA, the Coalition argues that the Board failed to properly consider the low-NOx vehicle credit option. According to the Coalition, the Board should have considered the low-NOx vehicle credit as either an alternative to the Regulation or as a mitigation measure to identified impacts arising from the Regulation. In a related argument, the Coalition further claims the Board also failed to consider a reasonable range of alternatives. And, related to the public protection aspect of CEQA, the Coalition contends the Board's regulatory approval is improper because it failed to properly respond to comments discussing the low-NOx vehicle credit option.

With respect to the APA, the Coalition contends the Board failed to conduct a proper economic impact analysis because it did not look at the impact on businesses that have already invested in the low-NOx industry. The Coalition also argues the Board should have considered the low-NOx vehicle credit as an alternative under the APA.

We first consider whether the Board properly rejected the low-NOx vehicle credit as an alternative and whether the Board considered a reasonable range of alternatives. We then consider whether the Board properly rejected the low-NOx vehicle credit as a mitigation measure and, relatedly, both whether the Board failed to properly respond to

11.

comments and whether such an error requires setting aside the Regulation. After considering the CEQA issues, we then turn to whether the Board violated the APA in its economic analysis or in its consideration of the low-NOx vehicle credit as an alternative to the Regulation.

For its part, the Board contends the trial court improperly augmented the administrative record with respect to the inclusion of a white paper cited by a commentor. We consider this issue after resolving the Coalition's points.[2]

### *The Board's Rejection of the Low-NOx Vehicle Credit Alternative Under CEQA*

The Coalition argues that the Board improperly rejected an alternative to the project under consideration. This argument focuses on an initial determination made by the lead agency in a CEQA analysis, the scope of alternatives that will be considered. To the Coalition, a valid and appropriate alternative was known by the Board but was not fully considered. The Coalition argues that the Board abused its discretion by failing to meaningfully consider a known alternative and failing to consider a reasonable range of alternatives. For the following reasons, we conclude that the Board did consider a reasonable range of alternatives and it was under no obligation to consider any one specific alternative, whether or not known to the Board.

*Standard of Review and Applicable Law*

Within the various requirements of CEQA is the requirement that the lead agency consider potentially feasible alternatives to a project. (*Citizens of Goleta Valley v. Board*

---

[2] Both the Coalition and the Board have filed motions for judicial notice related to documents outside of the administrative record. The Board's documents generally relate to separate regulations related to low-NOx technologies as well as a webpage describing entities associated with the Coalition. The Coalition's documents also generally relate to separate regulations and are partially offered in response to arguments made by the Board. Both parties argue this court should take judicial notice of these documents because they are relevant to issues raised on this appeal. This court has reviewed these documents and finds they are not material to resolving this appeal. Both the Board's and the Coalition's motions for judicial notice are therefore DENIED as irrelevant.

*of Supervisors* (1990) 52 Cal.3d 553, 565.) The lead agency is responsible for proposing the alternatives considered and, although they need not consider every potential alternative, must select "a range of reasonable alternatives to the project," which would avoid or substantially lessen a project's significant environmental impacts, "accomplish most of the basic objectives of the project," and be at least potentially feasible. (CEQA Guidelines,[3] § 15126.6, subds. (a)–(c), (f); see also *Citizens of Goleta Valley*, at p. 565 [noting that doctrine of feasibility guides local agencies in determining the nature and scope of alternatives to examine].)

In line with this principle, the environmental impact report (EIR) only needs to identify those alternatives necessary to permit a reasoned choice and then must examine in detail only those that " 'the lead agency determines could feasibly attain most of the basic objectives of the project.' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163.) " 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' " (*Ibid.*)

The lead agency begins by establishing the project objectives. (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1163.) The EIR "need not study in detail an alternative that is infeasible or that the lead agency has reasonably determined cannot achieve the project's underlying fundamental purpose." (*Id.* at p. 1165.) "Although a lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose and need not study alternatives that cannot achieve that basic goal." (*Id.* at p. 1166.)

We presume an EIR complies with the rule of reason; it is the appellant's "burden to demonstrate that the alternatives analysis is deficient." (*California Native Plant*

---

[3] The term "CEQA Guidelines" refers to the regulations codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA]." (CEQA Guidelines, § 15000.)

*Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987 (*California Native Plant Society*).) We thus defer to the selection of alternatives unless the Coalition (1) demonstrates the alternatives selected "are ' " 'manifestly unreasonable and … do not contribute to a reasonable range of alternatives' " ' " and (2) identifies evidence of an alternative that "was both 'feasible' and 'adequate,' because it was capable of attaining most of the basic objectives of the project." (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 345.) We "review an agency's substantive factual or policy determinations for substantial evidence." (*California Native Plant Society*, at p. 957.)

>    *Substantial Evidence Supports the Rejection of a Low-NOx Alternative*

The question before us at the stage where the lead agency chooses which alternatives to consider and which to reject is whether the decision is supported by substantial evidence and comports with the rule of reason. (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1167.) We conclude that the Board's decision here satisfies both criteria.

As noted above, the Board identified 12 objectives related to the proposed project, including accelerating the deployment of vehicles that achieve the maximum emission reduction possible, developing regulations consistent with the State Implementation Plan, leading the transition from internal combustion to all electric powertrains, complementing existing programs, incentivizing and supporting zero-emission technology, providing market certainty for ZEV, and spurring economic activity of zero-emission technologies, among others. These objectives led to a project defined by "two primary elements": first, requiring "manufacturers to make a percentage of truck and bus sales in California to be zero-emissions," and second, requiring "one-time reporting of information from large organizations including retailers, manufacturers, and government agencies, about contracted services requiring the use of trucks and shuttles in addition to their medium- and heavy-duty vehicle fleet."

With respect to the substantial evidence requirement, the project objectives contain multiple points which clearly indicate or strongly suggest the project at issue was designed to support a transition to ZEV in the relevant transport sectors. In contrast, the proposed alternative sought to permit the use of low-emission vehicles in place of some of the desired ZEV in order to smooth the transition to zero-emission technology. While this court can readily see how such a transitional change could decrease, rather than increase, overall pollution, we " 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' " (*In re Bay-Delta etc., supra*, 43 Cal.4th at pp. 1161–1162.) Given the overall scope of the project objectives, this court does not see defining the project as a move to ZEV to be unduly narrow or lacking substantial evidence. We therefore conclude it was reasonable for the Board to reject the low-NOx alternative in the same way an agency could reject inland building sites as an alternative option for a planned oceanfront development. (See *id.* at p. 1166.) The identified objectives of the Regulation provide substantial evidence supporting the conclusion that an alternative reaching similar goals but, in a manner, contradicting those objectives fails to achieve the project's fundamental purpose.

*The Board Considered a Reasonable Range of Alternatives*

Having concluded that the Board reasonably rejected the option of a low-NOx alternative, we next turn to the Coalition's argument that the actual range of alternatives considered were not reasonable. The Coalition acknowledges that the Board considered three alternatives, identified as the "No Project Alternative," the "Less Stringent ZEV Sales Requirement," and the "More Stringent ZEV Sales Requirement," but contends these alternatives were "manifestly insufficient because none 'could feasibly accomplish most of the basic objectives of the project' and 'avoid or substantially lessen one or more of its significant effects.' " The Coalition asserts that the low-NOx vehicle credit alternative highlights these failures because it is the only known option that would have

15.

"furthered most, if not all, of the project's objectives while still substantially lessening its short-term air quality effects."  We do not agree.

Upon recognizing that the Board could and did reasonably reject the low-NOx alternative suggestion because it did not meet the project's underlying fundamental purpose, the Coalition's argument that comparing the effects of that proposed alternative to those actually considered highlights the Board's failures is substantially diminished. That some aspect of the known environmental impact could be reduced by the low-NOx alternative is irrelevant if that alternative is fundamentally opposed to the acceptable definition of the project at issue.

In this way, the Coalition's reference to cases such as *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059 (*Watsonville*) are not persuasive. *Watsonville* and the case it relied upon (*California Native Plant Society*) for the general starting position that "the actual infeasibility of a potential alternative does not preclude the inclusion of that alternative among the reasonable range of alternatives," considered whether "potentially feasible" projects could be rejected merely because they did not meet one or more project goals.  (*Watsonville* at p. 1087, citing *California Native Plant Society, supra*, 177 Cal.App.4th at pp. 981, 999–1000.)  The court in *Watsonville* affirmed that such a narrow ground for rejecting an alternative was improper, noting that the question whether to reject a potentially feasible alternative turns on whether the alternative "would have been 'capable of avoiding or substantially lessening any significant effects of the project,' even if it 'would impede to some degree the attainment of the project objectives.' "  (*Watsonville* at p. 1087.)

In this case, the low-NOx vehicle credit alternative was identified as a potential alternative and dismissed as infeasible because it did not meet the project's underlying fundamental purpose.  As a logical matter, an alternative that does not meet the fundamental purpose of the proposed project cannot attain most of that project's basic objectives and therefore provides no relative indication that the actual alternatives

16.

considered were insufficient.  The low-NOx vehicle credit is thus not like the potentially feasible alternatives rejected in *Watsonville* because the proposal in this case does more than impede to some degree the attainment of project objectives.  The proposal here sought to undermine the fundamental purpose of the project.

As noted above, the guiding principle for whether the lead agency has considered a reasonable range of alternatives is the rule of reason, a test which states the EIR only needs to identify those alternatives necessary to permit a reasoned choice.  (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1163.)  The no project alternative, less stringent ZEV sales requirement, and more stringent in early years ZEV sales requirement alternatives satisfy this test.  In keeping with the underlying purpose of the Regulation—the adoption of zero-emission sales requirements to encourage development of zero-emission technologies—the Board looked at the environmental and technical consequences of not adopting relevant regulations as well as both speeding up and slowing down the sales requirement rates.  These options created a reasonable range of alternatives within the scope of the project from which a reasoned choice could be made.

### *The Board's Rejection of the Low-NOx Vehicle Credit as a Mitigation Measure Under CEQA*

In a partial continuation of its arguments regarding the Board's rejection of the low-NOx vehicle credit as a project alternative, the Coalition raises the separate argument that the Board improperly rejected the low-NOx vehicle credit as a mitigation measure to the recognized short term-air quality impacts expected from the project.  The Board responds by arguing that the mitigation argument was not properly exhausted and, thus, cannot be raised.  It further contends the mitigation measures were infeasible for the same reasons set forth in the alternatives analysis.

#### *The Board's Exhaustion Argument*

We first take up the Board's argument that the Coalition has failed to demonstrate an exhaustion of administrative remedies because it cannot point to any comments that

suggest the low-NOx vehicle credit should be considered as a mitigation measure to air quality impacts as opposed to an alternative to the proposal generally.

" 'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.' [Citation.] The exhaustion requirements are set forth in Public Resources Code section 21177. A petitioner has exhausted its administrative remedies if: (1) the alleged grounds for noncompliance with CEQA were presented by any person during the public comment period or prior to the close of the public hearing before issuance of the notice of determination; and (2) the party filing the CEQA action objected to the approval of the project during the public document period or prior to the close of the public hearing before the notice of determination was issued." (*Covington v. Great Basin Unified Air Pollution Control Dist.* (2019) 43 Cal.App.5th 867, 872–873.)

" 'The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.] The decisionmaking body " 'is entitled to learn the contentions of interested parties before litigation is instituted.' " ' [Citation.] [¶] To exhaust administrative remedies, '[m]ore is obviously required' than 'generalized environmental comments at public hearings.' [Citation.] 'On the other hand, less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding. This is because " '[i]n administrative proceedings, [parties] generally are not represented by counsel. To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair to them.' [Citation.] It is no hardship, however, to require a layman to make known what facts are contested." ' " (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 616, second, third, & fifth bracketed insertions added.)

In this case, the trial court found that the Board's burden to consider all potentially feasible mitigation measures and the large number of comments raising the low-NOx

18.

vehicle credit option properly placed the Board on notice of the issue. We agree. There is no shortage of comments in the record identifying the use of a low-NOx vehicle credit as a solution to various problems identified by commenters. Further, in at least some of these comments, use of a low-NOx vehicle credit is identified as a potential solution to air quality impacts, particularly in the short term, that are allegedly not solved by the Regulation.[4]

These comments clearly indicated to the Board that inclusion of a low-NOx vehicle credit option was desired, and the Board went so far as to note that it had rejected that option as an alternative to the project at hand. The comments also went beyond merely suggesting a low-NOx vehicle credit as an alternative or as a generalized solution. Rather, at least in some instances, the option was presented as something to consider in the context of air pollution concerns related to implementation of the Regulation. Although not a perfect call out of the issue raised on appeal, we conclude, as did the trial court, that such comments are sufficient to allow the Board to decide the matter at issue and to learn the contentions of interested parties surrounding the low-NOx vehicle credit option and its applicability to air pollution concerns. Given the specific facts of this case, we conclude that level of specificity is sufficient to exhaust the Coalition's administrative remedies with respect to claims the low-NOx vehicle credit should be considered as a mitigation measure to known air pollution impacts.

*The Board's Failure to Discuss the Low-NOx Credit as a Mitigation Measure*

Having concluded that the Coalition's arguments are not barred by exhaustion principles, this court next turns to whether the Board was obligated to consider and

---

[4] One exemplary letter notes specifically that "[h]eavy-duty low NOx technologies are certified by [the Board] as 90 percent cleaner than diesel and <u>available today</u> to help achieve NOx and toxic emissions goals" before providing a detailed summary of air quality issues in the South Coast and San Joaquin areas and the need for immediate action in those areas. Another highlights that an abrupt transition to a technology that is not readily available creates unknown "air quality trade-offs" given that certain sectors have already heavily invested in low-NOx fuel technologies.

19.

formally discuss the low-NOx vehicle credit option as a mitigation measure to the identified impacts the project would have on short-term air quality concerns. The Board argues from the position that the low-NOx vehicle credit was infeasible. It contends that this conclusion was reached when dismissing the low-NOx vehicle credit as an alternative. It then supports its position by asserting that it was not obligated to conduct further analysis after determining the air quality impacts arose from unspecified construction projects in unknown locations and by claiming the proposed low-NOx vehicle credit's alleged benefits are distinct from and unrelated to the localized air quality concerns identified.

Under Public Resources Code section 21002, it is "the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects" and that "in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof." Throughout the CEQA Guidelines and the relevant statutes, the phrase "feasible alternatives," "feasible mitigation measures," or something similar is often used. This is because there is a strong relationship between alternatives and mitigation measures. As our Supreme Court has explained, "[A]lternatives and mitigation measures have the same function—diminishing or avoiding adverse environmental effects. The chief goal of CEQA is mitigation or avoidance of environmental harm." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 403.) Although similar in nature, "under CEQA an [EIR] must include a meaningful discussion of both project alternatives *and* mitigation measures." (*Ibid.*)

As discussed above, when it comes to considering alternatives, the burden falls to the lead agency to define a reasonable range of alternatives and to explain why it has chosen to exclude certain alternatives from that discussion. The process for mitigation

measures is similar, but also distinct, in that all feasible mitigation measures known to the agency must be adopted, and therefore considered. (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 865–866.) Despite this difference, it is well understood both from the statutory language and the case law that "CEQA does not … require discussion of every mitigation measure the agency rejected as infeasible." (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 15 (*San Diego Citizenry Group*).)

In the alternatives context, the CEQA Guidelines explain that an alternative can be dismissed as infeasible for at least three reasons: "(i) failure to meet most of the basic project objectives; (ii) infeasibility; or (iii) inability to avoid significant environmental impacts." (CEQA Guidelines, § 15126.6, subd. (c).) As we found above, substantial evidence supports the Board's conclusion that the low-NOx vehicle credit option failed to meet most of the basic project objectives properly defined in the Board's scoping process. The question in the mitigation space, then, is whether that determination is sufficient to also support the implicit conclusion from the lack of discussion that the Board found the low-NOx vehicle credit option infeasible as a mitigation measure too.

The CEQA Guidelines do not provide the same guidance regarding the reasons a mitigation measure can be deemed infeasible as they do for alternatives. Thus, the standard definition contained in the CEQA Guidelines for "feasible" provides our starting point. There, " '[f]easible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (CEQA Guidelines, § 15364.) Although the CEQA Guidelines separate failing to meet project objectives from technical infeasibility and the inability to avoid significant environmental impacts in the context of alternatives, we do not read that simplified set of bases for rejection to indicate that failing to meet project objectives is not a form of infeasibility under the stated definition. In other words, we agree with the analysis in *San Diego Citizenry Group* that holds disagreements over

21.

legitimate policy determinations are not a basis for setting aside an EIR because " ' " '[f]easibility' under CEQA encompasses 'desirability' to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and technological factors" ' " included in the Guideline's definition of that term. (*San Diego Citizenry Group, supra*, 219 Cal.App.4th at p. 17.)

The question here then, as it was in *San Diego Citizenry Group*, is whether CEQA requires the discussion and incorporation of mitigation measures that would defeat the policy objectives defined by the Board's scoping process, as set forth in the EIR, and as relied upon to reject the same proposed measure as an alternative to the project. We reach the same conclusion as the court in *San Diego Citizenry Group*: CEQA contains no such requirement. CEQA does not guarantee an agency's decision will always be the most favorable to the environment. (*San Diego Citizenry Group, supra*, 219 Cal.App.4th at p. 18.) Rather, its goal in the context of disclosing information regarding public decisionmaking is to encourage informed public participation. (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 653.) "That an EIR's discussion of mitigation measures might be imperfect in various particulars does not necessarily mean it is inadequate." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 408.) "The proper judicial goal … is not to review each item of evidence in the record with such exactitude that the court loses sight of the rule that the evidence must be considered as a whole." (*Ibid*.)

We therefore consider whether substantial evidence in the record as a whole supports the Board's decision not to discuss the low-NOx vehicle credit option as a mitigation measure because it had rejected it as infeasible under the alternatives analysis. We conclude the evidence supports this conclusion. As discussed above, the Board properly scoped its project as an attempt to solve air quality issues by encouraging a full move to ZEV. It then publicly identified sufficient reasons in the alternatives discussion as to why the low-NOx vehicle credit option failed to meet those goals, rendering it

infeasible.  Upon concluding the low-NOx vehicle credit was infeasible from a policy perspective, the Board was not obligated to further consider the option in the context of mitigation measures, even if alerted to the potential use of the low-NOx vehicle credit in that space by commenters.  Disagreement with that policy driven decision "is not a basis for setting aside" the EIR.  (*San Diego Citizenry Group, supra*, 219 Cal.App.4th at p. 18.)

*The Board's Failure to Respond to Comments Regarding the Low-NOx Vehicle Credit*

The Coalition next argues that the Board violated CEQA by failing to respond to comments submitted during the EIR process that suggested the low-NOx vehicle credit be implemented in one form or another.  The Board contends that its decision to respond to comments in the final statement of reasons satisfied its obligations under CEQA but that even if this decision was erroneous, the Coalition cannot show the error was prejudicial or that the failure impaired informed decisionmaking or informed public participation.

The Board's assertion that its decision not to respond to comments until the final statement of reasons was an appropriate implementation of its own regulatory scheme in the context of balancing its obligations under both CEQA and the APA is not well supported.  The relevant regulation for the CEQA portion of the Board's duties is found in California Code of Regulations, title 17, section 60004.2.  Subdivision (b) of that regulation requires the Board to provide notice of its draft environmental impact analysis before accepting and responding to comments made over a 45-day period.  (Cal. Code Regs., tit. 17, § 60004.2, subd. (b)(1)–(3).)  The portion of that regulatory scheme regarding responding to comments explains that responses are required in the same manner as CEQA Guidelines section 15088.  (Cal. Code Regs., tit. 17, § 60004.2, subd. (b)(3)(A).)

A lead agency is required to evaluate and respond to comments raising significant environmental issues received during comment periods.  (CEQA Guidelines, § 15088,

subd. (a).)  These responses must be provided at least 10 days prior to certification of an EIR and must include a good faith, reasoned analysis in response to significant environmental issues raised.  (CEQA Guidelines, § 15088, subds. (b)–(c).)

The regulations identify three ways in which responses can be provided, specifically:  "(1) a revision to the draft Environmental Impact Analysis, (2) a separate section in or attachment to the Final Environmental Impact Analysis, or (3) a separate response to comments document."  (Cal. Code Regs., tit. 17, § 60004.2, subd. (b)(3)(D).)  Regardless of the response form chosen, however, after the comment period, the Board is then required to create a Final Environmental Impact Analysis.  (Cal. Code Regs., tit. 17, § 60004.2, subd. (b)(5).)  No project may be approved by the Board until after it considers the Final Environmental Impact Analysis, certifies it was completed in compliance with the regulatory program among other requirements, and considers the responses to comments submitted during the process.  (Cal. Code Regs., tit. 17, § 60004.2, subd. (c)(1)–(2).)  Approval "shall occur on the date of the board meeting in which the [Board] approves or approves for adoption the project, consistent with [CEQA Guidelines] section 15352[, subdivision ](a)."  (Cal. Code Regs., tit. 17, § 60004.2, subd. (c)(3).)

In this case, the Board reviewed the final environmental analysis and voted to send the regulatory package to the executive officer at its June 25, 2020 meeting.  At that time, the Board's vote allowed the executive officer to complete the regulatory package if no further changes were made.  Under any reading of the regulatory structure noted above, the complete resolution of the considered terms of the Regulation constituted an approval that could not, under those same regulations, occur until the Board had considered the responses to properly submitted comments.  No party alleges that responses to the specific issues raised here were considered at that time.

As the trial court found, this was improper.  The low-NOx vehicle credit option was a known proposal that had been raised in several comments and rejected by the

24.

Board as infeasible. The adoption of a low-NOx vehicle credit was a significant environmental concern in light of the recognized environmental consequences of adopting the Regulation and had been raised in several manners by commenters. Under the relevant procedures, the Board should have responded to these comments prior to adopting the final environmental analysis.

The trial court found this error harmless, however, on the ground that comments were later discussed and the low-NOx vehicle credit was discussed in the regulatory documents. The Board contends, in line with this thinking, that any alleged error was in fact harmless. We agree with the trial court that, under the specific facts of this case, the error was harmless.

As the Board notes, our Supreme Court has found that the failure to respond to certain comments during the CEQA process will not manifestly constitute reversible error. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 487.) However, the Supreme Court's statements in this area make clear several points that must be kept in mind when there has been an omission of relevant information. The first, and the guiding principle, is that a failure to follow the law that frustrates the purpose of CEQA is, in fact, prejudicial, and the failure to follow mandatory procedures is presumptively so. (*Id.* at p. 485.) Next is that public comments are an integral part of CEQA which may contain information critical to the process. (*Id.* at p. 486.) "[P]ublic review provides the dual purpose of bolstering the public's confidence in the agency's decision and providing the agency with information from a variety of experts and sources." (*Ibid.*)

Following from this is the principle that a failure which frustrates the purpose of CEQA is not always obvious. "[C]ourts are generally not in a position to assess the importance of the omitted information to determine whether it would have altered the agency decision, nor may they accept the post hoc declarations of the agencies themselves." (*Environmental Protection Information Center v. California Dept. of*

25.

*Forestry & Fire Protection, supra*, 44 Cal.4th at p. 487.) Accordingly, errors of omission should generally be deemed prejudicial unless the agency that failed to consider the comments satisfies its burden to show the error was immaterial. This can be done in limited circumstances, such as where "the material not considered was, on its face, demonstrably repetitive of material already considered, or so patently irrelevant that no reasonable person could suppose the failure to consider the material was prejudicial, or when the omitted material supports the agency action that was taken." (*Ibid.*)

As this court's discussion above shows, the Board was aware of the low-NOx vehicle credit and did discuss it in its final environmental analysis. This discussion was sufficient to demonstrate that the Board did not consider the low-NOx vehicle credit to be a reasonable alternative in light of the nature and scope of the Regulation. Although the Board only publicly considered the low-NOx vehicle credit in its discussions of potential alternatives and made no formal mention of it in the mitigation measures discussion, its response and conclusion were sufficient to put the public on notice that the Board considered the low-NOx vehicle credit to contradict the nature of the project. In this sense, the Board's failure is most in line with the example of omitting information that was so patently irrelevant that no person could suppose the failure was prejudicial.

A failure to respond to comments that support a proposal that was considered and rejected as unreasonable is the type that can be shown to be harmless. In this case, the Board satisfies this showing because it had already expressly informed the public of its view that the proposal was contrary to the nature of the project and the comments did not raise anything more than generalized requests to include the proposal in light of various economic and environmental factors. Its failure to provide more detailed or more specific responses thus did not hinder the ability to conduct public decisionmaking or the ability to have informed public participation, both because the general proposal was demonstrably considered in another context and because the omitted material was

generally irrelevant in light of the proper determination the proposal ran contrary to the scope of the regulatory project.

### The Board's Actions Under the APA

In addition to its CEQA claims, the Coalition asserts that the Board violated the APA in two ways.  First, the Coalition claims the Board was required, but failed, to consider the economic impact the Regulation would have on businesses that had already invested in low-NOx technology.  Second, the Coalition claims the Board failed to adequately consider the low-NOx Option as an alternative under the distinct requirements of the APA.  We find neither argument persuasive.

*Standard of Review and Applicable Law*

"[T]he APA establishes basic minimal procedural requirements for rulemaking in California.  [Citation.]  'Pursuant to those procedural requirements, agencies must, among other things, (1) give the public notice of the proposed regulatory action; (2) issue a complete text of the proposed regulation with a statement of reasons for it; (3) give interested parties an opportunity to comment on the proposed regulation; (4) respond in writing to public comments; and (5) maintain a file as the record for the rulemaking proceeding.' " (*John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 111 (*John R. Lawson Rock & Oil*).)  As part of these requirements, and relevant to the disputes raised in this case, an agency is required to conduct both an economic impact assessment and a reasonable alternatives analysis.  (Gov. Code, §§ 11346.2, subd. (b), 11346.9, subd. (a)(4).)

For the economic impact assessment, a "state agency proposing to adopt, amend, or repeal any administrative regulation shall assess the potential for adverse economic impact on California business enterprises and individuals, avoiding the imposition of unnecessary or unreasonable regulations or reporting, recordkeeping, or compliance requirements." (Gov. Code, § 11346.3, subd. (a).)  The analysis is "intended to provide agencies and the public with tools to determine whether the regulatory proposal is an

efficient and effective means of implementing the policy decisions enacted in statute or by other provisions of law in the least burdensome manner." (Gov. Code, § 11346.3, subd. (e).) The analysis must include a "description of all cost impacts, known to the agency at the time the notice of proposed action is submitted to the office, that a representative private person or business would necessarily incur in reasonable compliance with the proposed action." (Gov. Code, § 11346.5, subd. (a)(9).)

For the reasonable alternatives analysis, after all relevant periods of public comment, the agency seeking to create a new regulation must submit a final statement of reasons that includes a "determination with supporting information that no alternative considered by the agency would be more effective in carrying out the purpose for which the regulation is proposed, would be as effective and less burdensome to affected private persons than the adopted regulation, or would be more cost effective to affected private persons and equally effective in implementing the statutory policy or other provision of law." (Gov. Code, § 11346.9, subd. (a)(4).) Relatedly, the agency must submit an "explanation setting forth the reasons for rejecting any proposed alternatives that would lessen the adverse economic impact on small businesses." (Gov. Code, § 11346.9, subd. (a)(5).)

A regulation may be overturned based on a failure to properly complete either of these requirements. However, the bases for overturning a regulation are limited. Under the statutory scheme, a "regulation or order of repeal may be declared to be invalid for a substantial failure to comply" with the APA. (Gov. Code, § 11350, subd. (a); see *California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 303 (*Maxwell-Jolly*) ["The regulation 'may' be declared to be invalid by a court because of a ' "substantial failure" to comply with' the APA."].) "In addition to any other ground that may exist, a regulation or order of repeal may be declared invalid if either" the agency's determination that a regulation is reasonably necessary to support the purpose of a statute "is not supported by substantial evidence" or the "agency declaration

28.

pursuant to paragraph (8) of subdivision (a) of [Government Code s]ection 11346.5 is in conflict with substantial evidence in the record." (Gov. Code, § 11350, subd. (b)(1)–(2); see *Maxwell-Jolly*, at p. 304 [summarizing same].)

The language referencing a substantial failure to comply is understood as requiring "substantial compliance" with the substance essential to the reasonable objectives of the statutory scheme. (See *Maxwell-Jolly, supra*, 199 Cal.App.4th at p. 307.) " ' " 'Where there is compliance as to all matters of substance[,] technical deviations are not to be given the stature of noncompliance.… Substance prevails over form.' " ' " (*Ibid.*; see *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1073 ["noncompliance is insubstantial, or 'harmless,' only where it does not compromise any 'reasonable objective' of the APA"].) " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] "Substantial evidence … is not synonymous with 'any' evidence." Instead, it is " ' "substantial" proof of the essentials which the law requires.' " [Citations.] The focus is on the quality, rather than the quantity, of the evidence.' " (*Maxwell-Jolly*, at p. 308.)

*The Board Properly Considered the Regulation's Impact on Industry*

The Coalition argues that the Board only considered impacts on three groups: (1) manufacturers subject to the Regulation's sales requirements; (2) fleets subject to the Regulation's reporting requirements; and (3) petroleum and related industries that would experience reduced demand due to the Regulation. The Coalition contends this limited analysis was improper because the APA requires the Board to assess impacts on industries affected by the Regulation, a term that the Coalition contends encompasses a wide array of impacts—not merely direct regulation. The Coalition further states that this court has already recognized this broad duty to consider affected industries through its opinion in *John R. Lawson Rock & Oil* and therefore the Board's failure to consider the impact on their portion of the industry cannot stand.

As the Board points out, however, its economic analysis was not as limited as the Coalition contends. At a high level, the Board conducted an economic analysis that it claims covered more than 160 different industries. But more to the point of the arguments before this court, the Board claims its overall economic analysis considered impacts on "truck fleets and others who buy trucks from manufacturers" subject to the Regulation. In this analysis, the Board looked at the impacts of the Regulation on trucking fleets that ultimately choose to buy ZEV, an act which the Board recognizes is not required. Included in this discussion were incurred maintenance costs, maintenance bay upgrade costs, mid-life costs, such as battery replacement, and private fueling infrastructure installation and maintenance costs to those fleets that switched to ZEV, among others. According to this analysis, fleets of all types that chose to purchase ZEV would expect to see overall cost savings, despite the upfront outlays, "as the operational cost savings of the ZEV[] outweigh the potential infrastructure and vehicles prices."

After this analysis was released, the Board received a comment stating the analysis "did not take into account the billions of dollars spent on [compressed natural gas] fueling infrastructure, facility maintenance, and training." The Board responded to this comment by explaining that no changes were made, in part, because fleets will only "purchase ZEV[] if it makes financial sense for them to do so, including infrastructure costs and expenses," and "have no obligation to purchase ZEV[]." The response continued to explain that any assertion "the cost burden of the [R]egulation is higher for a fleet that invested in [compressed natural gas] infrastructure" than for other fleets "is incorrect," in part because those fleets that have already invested in compressed natural gas infrastructure have the ability not to incur costs under the Regulation by not purchasing ZEV.

This factual history clearly distinguishes this case from *John R. Lawson Rock & Oil*, where the Board was made aware of direct intrastate differences in the way proposed regulatory changes would affect the trucking industry, and particularly small businesses

within that industry. However, based on an incorrect view of its obligations under the APA, the Board declined to consider those differences based on assertions they were not required to do so. This court rejected that line of argument, holding, as the Coalition notes, that the requirements of the APA demand that responsible entities consider all industries impacted by proposed regulations—including when those impacts are purely intrastate differences within an industry. (*John R. Lawson Rock & Oil, supra*, 20 Cal.App.5th at pp. 115–116.)

In this case, the Board conducted an industry-wide economic analysis of trucking fleets that may purchase ZEV under the Regulation and found there would be no meaningful economic impact. In response to this analysis, the Board was made aware of a potential segment of that industry that felt its prior investments in alternative technologies needed to be accounted for in the analysis.[5] In contrast to *John R. Lawson Rock & Oil*, the Board responded to these comments by considering the argument and rejecting it on the ground that such claims were not supportable. In this sense, the Board followed the direction of *John R. Lawson Rock & Oil* and its related reading of the APA and did, in fact, consider whether the proposed segment of the industry was actually affected by the Regulation. It's conclusion that no such impact existed requiring further comment was thus not an improper reading of the APA, but rather a factual determination supported by proper analysis under the correct legal standards. To the extent the Coalition now claims that analysis failed to properly apply the APA, we reject that claim under the facts of this case.

---

[5]     Comments cited by the Coalition generally identify industries which have invested in alternatives to ZEV asserting that they would like their investments to be accounted for in the Regulation. This court accepts, without holding, that these comments are sufficient to identify an industry participant for additional consideration under the APA's requirements for the purposes of the argument made in this case.

31.

*The Board Properly Rejected the Low-NOx Vehicle Credit as an Alternative*

The Coalition also argues that the Board failed to describe the low-NOx vehicle credit as a reasonable alternative to the Regulation and failed to provide its "reasons for rejecting those alternatives" under the APA, in part by failing to tie its conclusion to the authorizing statute. The Coalition recognizes this argument parallels that raised under CEQA, but quotes specific language contained in Government Code section 11346.9, subdivision (a)(4) that requires the Board to explain with supporting information why reasonable alternatives are not " 'as effective and less burdensome to affected private persons than the adopted regulation, or would be more cost effective to affected private persons and equally effective in implementing the *statutory policy or other provision of law*.' "

The Board responds by noting that it did provide a discussion of the low-NOx vehicle credit in its reasonable alternative analysis section, even though it had concluded the alternative was not, in fact, reasonable and that its stated reasons "why the partial credit approach was not a reasonable alternative 'remains consistent throughout and is reflected in the administrative record.' " The Board claims that both its reasons for rejecting the low-NOx vehicle credit as unreasonable and its discussion of additional factors supporting its rejection are supported by substantial evidence and therefore proper.

Upon review of the Board's analysis, we do not agree that the Board improperly rejected the low-NOx vehicle credit. The Board was clearly aware of the concept of the low-NOx vehicle credit and noted its existence in its discussion of potential alternatives. It concluded, however, that the suggestion would "not advance the adoption of heavy-duty zero-emission technologies" and was "not, functionally, a true alternative to the proposed [R]egulation because it does not propose an alternative to the core element of the … [R]egulation which is a ZEV sales requirement."

32.

Under Government Code section 11346.2, subdivision (b)(4)(A), "[r]easonable alternatives … include, but are not limited to, alternatives that are proposed as less burdensome and equally effective in achieving the purposes of the regulation in a manner that ensures full compliance with the authorizing statute or other law being implemented or made specific by the proposed regulation." In this case, the Board rejected the proposed alternative, in part, because it did not meet the goal of implementing a zero-emission sales requirement.

In its initial statement of reasons, the Board set out the goals of the state's existing State Implementation Plan, along with other existing requirements, such as the 2017 Climate Change Scoping Plan, Sustainable Freight Action Plan, 2016 ZEV Action Plan, and many executive orders regarding reducing air pollution and implementing zero-emissions strategies. The Board spent considerable time laying out the general regulatory and legal framework supporting its regulatory efforts. Included within this discussion were direct references to the fact the Regulation would support Assembly Bill No. 739 (2017–2018 Reg. Sess.), which enacted Public Resources Code section 25722.11. That statute provides: "Beginning December 31, 2025, at least 15 percent of newly purchased vehicles with a gross vehicle weight rating of 19,000 pounds or more purchased by the Department of General Services and other state entities for the state fleet shall be zero emission. Beginning December 31, 2030, at least 30 percent of newly purchased vehicles with a gross vehicle weight rating of 19,000 pounds or more purchased by the Department of General Services and other state entities for the state fleet shall be zero emission." (Pub. Resources Code, § 25722.11, subd. (a).) The same discussion and citations carried over into the final statement of reasons and, ultimately, resulted in a similar rejection of the proposed alternative for failing to meet the needs of the overall statutory and regulatory authority.

At the core of the issue, then, the Board identified legal and regulatory structures that focused on sales of ZEV to meet multiple environmental goals and developed a

Regulation targeted at ensuring legal sales requirements could be met, among other goals. Its legally permissible focus on zero-emission sales meant that the low-NOx option, which allowed for sales of vehicles that were not zero-emission to replace those required zero-emission targets, was not a reasonable alternative and could be rejected without substantial comment. (See *Wendz v. State Dept. of Education* (2003) 93 Cal.App.5th 607, 656–657 [an agency need not respond to every alternative proposal presented by the comments if those proposals are not reasonable].) Although the Board went further and identified other bases by which it felt the option was not viable, its core conclusion that the option was not viable was legally supportable and therefore a satisfactory basis to reject the alternative.

### *Any Error in Augmenting the Record was Harmless*

In their affirmative appeal, the Board contends the trial court incorrectly granted the Coalition's motion to augment the administrative record with respect to one specific document, a white paper known as the Game Changer Report. According to the Board, through imprecise argument, the trial court came to believe this white paper had been cited and hyperlinked in a comment letter. The Board contends that this conclusion was incorrect and no other basis exists to include the document in the administrative record or to properly take judicial notice of the document.

Even assuming error, the Board has failed to demonstrate any prejudice from the admission of this single document in these proceedings. There is no presumption that errors in CEQA cases are prejudicial, and "[i]nsofar as prejudice resulting from the inclusion of *too much information* in the administrative record is concerned," such actions are generally beneficial to the project proponents, such that " '*the burden of showing prejudice from any overinclusion of materials into the administrative record must be on the project opponents*, who have the most to gain from any underinclusion.' " (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 534–535.)

Here, the disputed document does not affect the analysis of the trial court or of this court.  As such, its allegedly erroneous inclusion in the administrative record shows no indication of prejudice.  While the Board reasonably fears that broad inclusion of all documents cited, and those cited within cited documents, would result in a cascading problem of overinclusion, the record does not indicate such a practice exists which requires appellate correction.

## DISPOSITION

The judgment is affirmed.  Costs are awarded to the Board.


HILL, P. J.

WE CONCUR:


MEEHAN, J.


SNAUFFER, J.